IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITES STATES OF AMERICA | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:05cv1178-T |
| | ) |
| HORACE MILTON BLACK | ) |

**AFFIDAVIT OF TERRY R. SMYLY**

My name is Terry R. Smyly. I make this affidavit pursuant to court order dated March 17, 2006, and in response to Horace Black's 2255 challenge to his conviction and sentencing for armed robbery in the above styled case. I was appointed counsel for Horace Black in that case. As I have previously attested, I met with Mr. Black at the Montgomery City Jail after he was sentenced in order to discuss whether or not he wanted to appeal even though he had plead guilty pursuant to a plea agreement and had been sentenced to a term of imprisonment far less than he would likely have received had he gone to trial and been convicted which was a near certainty given the evidence against him, and he specifically advised me that he did not want to appeal. I now further respond to the summary of claims of inadequate representation advanced by the Public Defender on Mr. Black's behalf as follows:

The discovery I obtained from the Federal Defender (who represented Mr. Black from August 11, 2004, to October 25, 2004) revealed that on August 5, 2004, at approximately 7:45 am., two black males wearing masks forced their way at gun point into the Peoples Bank and Trust near the Greenville exit on I-65, assaulting the bank manager in the process, brandishing their weapons, and threatening to kill her if she did not cooperate. An arriving employee noticed something wrong and called the police. The police arrived shortly thereafter and the two black males fled without obtaining any money. The police observed two black males running through an apartment complex near the bank, one of whom exited the complex onto an adjacent golf course. The police surrounded the area and found and arrested Mr. Black who was laying in the grass wearing only a pair of pants. Nearby, the police found a discarded tan jumpsuit (like one worn by one of the robbers in the bank as shown in the bank video), a pair of basketball shoes, a black shirt, and a silver 9mm semi-automatic handgun (later determined to have been stolen out of Clermont, Florida).

Mr. Black had been interviewed twice at the Greenville Police Department. (On each occasion he signed a waiver of rights form before being interviewed, copies of which were obtained.)

The first interview occurred on August 5, 2004, the same day he was apprehended. He initially gave his name as Andre Smith of 1711 East Court Street, Montgomery, Alabama. After

1

being shown a picture of himself, he admitted that he was Horace Black. He said he had come to Greenville two weeks earlier to care for his Aunt Emily who lived in a trailer park on County Road 10. He said he gone to the CBC Lounge the night before (Wednesday night, the attempted robbery occurred Thursday morning), left the bar about 1:a.m. and walked to the golf course where he fell asleep. (The police subsequently determined that the CBC Lounge was only open on Friday's, Saturday's, and Sunday's and was for members only.)

The second interview occurred a day or so later. In the second interview (an FBI agent was present) Mr. Black admitted he had traveled from Florida to Alabama with three individuals whom he identified as Battle, Man, and Magic, for the purpose of robbing a bank. He said he was basically a street level enforcer for the gang, that he was just the look-out, that he was supposed to hide out and to contact Magic if he saw any police. He said Battle and Man actually robbed the bank. He said they had walkie-talkies. He said that he hid out like he was supposed to do and that after about 20 minutes he saw a police car and notified Magic. He said about 10 minutes later he saw Battle and Man running through the golf course. He said he ran to where Magic was and that Magic told him to go lay down in the woods.

When I first met with Mr. Black after being appointed we discussed whether he wanted to go to trial or to enter into a plea agreement and to continue to cooperate. We talked about his chances at trial and I told him that I did not think they were very good, that not only would we have to successfully suppress both of his statements, especially the second, which was unlikely, but that we would have to present somehow a plausible explanation for the circumstances under which he was found (assuming the first statement was suppressed, and if it were not then the government would have a statement that had already been discredited), and that he could not take the stand to testify because of his extensive criminal history. The discovery I had obtained from the Public Defender included a criminal history printout that showed at least 11 prior state convictions in Florida, the first in May of 1993 at age 16 for tampering with a witness and battery, and the last in June of 2002 at age 24 for resisting an officer with violence and criminal mischief. In between were two possession of cocaine convictions at ages 19 and 20, one possession of cocaine with intent to sell conviction at age19, and one possession of marijuana conviction at age 21. He appeared to fall easily into Criminal History Category VI. (The probation officer subsequently determined that he had a total of 33 criminal history points and that there was an additional conviction for possession of cocaine with intent to sell in 1994 at age 17 not previously known that made him a career offender.)

Mr. Black told me that he wanted to cooperate and that the Federal Defender had told him that if he cooperated he could get out in three years. I told him that from what I saw I did not see how that could be possible. I told him that on the gun charge alone, if he was convicted, he was looking at 7 years in addition to and on top of what he got on the aiding and abetting armed bank robbery charge, and that if he went to trial on the armed robbery charge and was convicted he would likely receive the maximum or near to it because of his criminal history. I told him that he was looking at possibly 32 years in prison and that I did not believe that the Government would ever agree to a 36 month plea. I told him that if he still wanted to cooperate that set up a proffer

meeting (I explained to him what that was and how it worked and that nothing he said in his proffer could be used against him if he subsequently decided to go to trial unless he took the stand and testified differently from his proffer) and that after it was over I would get him the best offer that I could for a change of plea and he could then decide if he wanted to plead. He agreed to go forward with a proffer and I set it up. At the proffer he gave the government more information but it was nothing concrete, mostly just street talk according to the AUSA, and it appeared that way to me. He did, however, make one important change, he identified another individual not Battle, as being the leader in the bank robbery. Although I never discussed it with the government, I felt that one change made him all but useless as a trial witness for the government against any of the others involved, none of whom had been arrested at that point. I did discuss my thoughts in that regard with Mr. Black after the proffer.

Based upon his proffer, the government offered Mr. Black a plea agreement pursuant to which, if Mr. Black cooperated as agreed, the gun charge would be dropped and he would be sentenced under the guidelines (which had some two weeks earlier had been held by the Supreme Court to be advisory only) and the government would recommend a three level downward departure at sentencing. Because of Mr. Black's extensive and complicated criminal history the government was unwilling at that time to agree to a sentence certain. I did not advise Mr. Black to accept or not accept the plea agreement. What I did was go through it line by line and explain it. I discussed with him in detail what I thought his sentence would be based on the criminal history provided by the Public Defender along with the other discovery that had been obtained before I was appointed. I cautioned Mr. Black numerous times that if there were additional offenses it could change and lengthen his sentence. I told him that based on what was known that with a three level downward departure, I thought he would receive maybe 108 months. I was careful to caution him that I could be wrong.

As for the waiver of appellate rights in the plea agreement, I did not recommend that the plea agreement be rejected in an effort to force better terms regarding appeal because I did not see the government as receptive and we really had nothing to negotiate with except to force the government to go to trial. I was concerned that Mr. Black's cooperation so far had been little more that street talk (I had discussed that concern with Mr. Black several times) and that the government might decide he was not being straight with them and back out, and Mr. Black had made it very clear to me that he did not want to go to trial. So I just explained the agreement in detail, including the appeal waiver provisions, and left the decision to him.

As it turned out, there was an additional conviction in his background that resulted in his being designated a career offender. Mr. Black has alleged that I did not obtain the records regarding that conviction and that it was not a felony. I did obtain copies of the court records concerning that conviction. I obtained them from the probation officer prior to sentencing. Copies of the records I obtained are attached hereto as Exhibit A. Mr. Black has also asserted that I should have filed a motion for downward departure. I did not file a motion for downward departure because I negotiated directly with the government and obtained an additional departure of one more level and a sentencing recommendation at the bottom of the range based on everyone

3

having entered into the plea agreement thinking that there were no other relevant convictions and that the newly discovered conviction occurred when he was 17 and because he was now 28 and had had so many convictions it was not unreasonable for him to have forgotten. The same arguments I would have made to the court in support of a downward departure. What the government agreed to recommend, and did recommend at sentencing pursuant to our negotiations was a sentence of 140 months. Since the probation officer took part in these negotiations by being present, he supported the government's recommendation at sentencing. Had I sought a downward departure by motion opposed by the government and not supported by the probation officer, it is most unlikely that I would have been successful.

Even with the negotiated downward departure, which occurred after sentencing had been set and immediately before the probation officer completed his final presentence report, Mr. Black decided he wanted to withdraw his guilty plea. I did not have very much time to come up with an argument that the court might accept. And about that time I came down with the flu. I should have sought additional time, but I did not. Instead, while very sick, I crafted a theory based upon an erroneous unchecked assumption as to the sequence of events and filed a motion to withdraw plea. The government pointed out my error in its reply brief. At sentencing the court took up my motion to withdraw plea on Mr. Black's behalf first. I acknowledged my error of argument as pointed out by the government, noted that Mr. Black's desire to withdraw his plea of guilty was against advice of counsel, and then advocated for Mr. Black's withdrawal of his plea. The court also allowed Mr. Black to speak on his own behalf. The court cautioned Mr. Black about the likely outcome if he were allowed to withdraw his plea, and appeared to be very near allowing him to withdraw his plea and go to trial, but finally the court denied the motion and proceeded to sentencing. After hearing from me as Mr. Black's defense counsel, from the government, and from the probation officer, the court sentenced Mr. Black to 140 months as recommended. But for a while it did not appear that the court was going to accept the recommendation and I was not at all certain that the court was going to do so.

When I went to see Mr. Black after sentencing to see if he wanted to appeal the denial of his motion to withdraw his guilty plea, which he could have appealed, he had changed his mind and not wish to appeal. I could have obtained a signed statement from him regarding his decision not to appeal, I suppose, but I did not do so. The comments of the court had made an impression on him, he said, and that it was time for him to turn his life around. He thanked me for representing him and told me he did not want to appeal. He seemed quite sincere and resolved about accepting responsibility and turning his life around

Mr. Black has asserted that he tried to contact me after that a number of times but was always told that I was not available. He even asserts a three way call set up by his sister who was told that I was not there. That could not have happened. During all of my representation of Mr. Black I worked alone in an office without a staff. My phone system was set up such that if the phone was not answered an answer machine would pick up and a voice message (my voice) would ask the caller to leave a message. Neither Mr. Black nor anyone on his behalf ever left me a message. If I was at the office it was my unvarying practice to answer the phone. There were

4

no exceptions. My phone would still ring through even if I was online. If I happened to be on the phone, a backup voice message through the service provider would answer (again in my voice) and ask the caller to leave a message. I also had caller ID and if a call had been made to my phone from the city jail I would have known it as I checked regularly, at least twice daily, even if I was not in the office. Had I received a call from the city jail, even with no message, I would have known it and I would have gone to see Mr. Black as promptly as I could. There was never any indication from caller ID that anyone called me from the city jail or from Florida where his family was. Moreover, if his sister set up a three way then she most certainly could have left a message, in fact she or anyone else on Mr. Black's behalf could have left a message, any message, anytime he or she wanted. If Mr. Black had told me he wanted to appeal I would have filed a notice of appeal. If anyone had left a message telling me Mr. Black wanted to appeal, I would have immediately verified his desire and filed a notice of appeal unless the time for appeal had run, in which case I am not sure what I would have done, but I would have done what I could, but that never happened either.

_____
Terry R. Smyly, Affiant

Sworn to and subscribed before me this the 23rd day of June, 2006.

_____
Notary Public
My commission expires: 7-27-2008

### Certificate of Service

I hereby certify that I have served a copy of the foregoing upon the United States, and upon Horace Black's appointed counsel by placing copies in the United States Mail, postage prepaid and properly addressed as follows on this the 23rd day of June, 2006:

_____
Terry R. Smyly

5