IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HORACE MILTON BLACK, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv1178-WKW-DRB |
| | ) | [WO] |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent*. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This 28 U.S.C. § 2255 motion, as amended, has been submitted on the pleadings, written submissions, and an evidentiary hearing. After due consideration, including scrutiny of the record in this case, the court concludes that no relief is warranted.

## I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A.    Plea Agreement and Hearing

On August 17, 2004, a federal grand jury returned a two-count indictment against the petitioner, Horace Milton Black ("Black"), for *aiding and abetting an armed bank robbery*, in violation of 18 U.S.C. §§ 2, 2113(a) and (d) (Count 1),  and  *using and carrying a firearm during and in relation to a crime of violence*, in violation of 18 U.S.C. § 924(c)(1) (Count 2).

On January 24, 2005, Black appeared before the undersigned magistrate judge and pleaded guilty to Count 1. As consideration for his guilty plea and pursuant to a written plea

agreement, the United States ("the government") agreed to be bound as follows::

- the government would dismiss Count 2 of the indictment;

- if Black did not obstruct justice or otherwise fail to accept responsibility, the government would recommend at sentencing that he receive a two-level reduction in his offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a);

- should the government find that Black assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to plead guilty, thereby permitting the government to avoid preparing for trial and to allocate its resources efficiently, the government would move at sentencing for a further reduction of one level pursuant to U.S.S.G.§ 3E1.1(b);.

- should Black complete his obligations under a cooperation agreement set forth in the plea agreement, the government would move at sentencing for a downward departure of at least three levels pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) to reflect his substantial assistance;

- should Black provide further cooperation after sentencing, the government could, at its discretion, move for a further sentence reduction pursuant to Fed.R.Crim.P. 35; and

- the government reserved the right to inform the court and probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offense and the defendant's background.

Black committed to the following under the plea agreement:

- to plead guilty to Count 1;

- not to commit another offense while awaiting sentencing;

- to the full application of the Sentencing Guidelines to his

2

offense; and

- to agree that the facts that determined his offense level would be found by the court at sentencing by a preponderance of the evidence and that the court could consider any reliable evidence, including hearsay.

The written plea agreement also contained a waiver provision, whereby Black relinquished (1) his right to appeal his conviction and sentence on any ground and (2) his right to attack his sentence in any post-conviction proceeding. Notwithstanding such waivers, however, the plea agreement specifically reserved to Black the right to appeal any upward departure imposed at sentencing and the right to appeal on the grounds of ineffective assistance of counsel and prosecutorial misconduct.

At the plea hearing conducted pursuant to Rule 11, Fed.R.Crim.P., the magistrate judge informed Black that the charge to which he was pleading guilty carried a statutory maximum sentence of 25 years. Black affirmed to the magistrate judge that he understood this maximum sentence. The magistrate judge also explained , and Black again affirmed his understanding, that his actual sentence could not be determined until the probation office completed a Presentence Investigation Report ("PSI") and that any sentencing advice that had been given to him represented only a good faith judgment based upon the information known by his counsel and the government's lawyers.[1]

---

[1]In addition, ¶ 9 of the written plea agreement stated that "[t]he offense level or criminal history category, as calculated by the Probation Officer and determined by the court, may differ from that projected by defendant's counsel or the U.S. Attorney." (Doc. No. 29 at 12.)

**B.     Sentencing Hearing**

The probation office prepared a PSI recommending that Black be sentenced as a career offender pursuant to U.S.S.G. § 4B1.1 because he had two state felony convictions in Florida for controlled substance offenses.[2]  At his April 12, 2005, sentencing hearing, Black moved to withdraw his guilty plea, stating as grounds that he had no idea when he pleaded guilty that he could be sentenced as a career offender.  After hearing argument on the issue, the district court denied Black's motion to withdraw his plea.

Upon finding that Black qualified as a career offender and applying a three-level reduction for acceptance of responsibility and a four-level downward departure, the court determined Black's offense level to be 27.[3]  Combining his offense level  with his criminal history category of VI[4] produced an advisory guideline range of 130-162 months for Black's offense.  The district court sentenced Black to a prison term of 140 months and entered Judgment on April 14, 2005.  Black did not appeal.

---

[2]U.S.S.G. § 4B1.1(a) provides that "[a] defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instance offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

[3]Because he was classified as career offender, Black's *base* offense level was 34.  *See* U.S.S.G. § 4B1.1(b).  As provided in the plea agreement, the government moved at sentencing for Black to receive the downward departures for his acceptance of responsibility and his substantial assistance.

[4]"A career offender's criminal history category in every case ... shall be Category VI." U.S.S.G. § 4B1.1(b).

**C.**    **Section 2255 Contentions**

On December 1, 2005,[5] Black filed a 28 U.S.C. § 2255 motion which asserted the ineffectiveness of his counsel, Attorney Terry Smyly, for failing to file an appeal after being instructed to do so. (Doc. No. 1.) The government's response included a supporting affidavit from Atty. Smyly, who maintained that during his meeting with Black following his sentencing, Black specifically advised him that he did not want to appeal. (Doc. Nos. 3 & 4.) In opposition to the government's submissions, Black filed an affidavit in which he reasserted his contention that he had instructed Atty. Smyly to file an appeal. (Doc. No. 12.)

On March 10, 2006, Black amended his § 2255 motion to add a claim that Atty. Smyly rendered ineffective assistance by failing to secure or investigate Florida state records which would have negated his classification as a career offender, more specifically, that a "possession with intent to sell cocaine" charge in Case No. CR94-915 – which the district court treated as a predicate felony offense when sentencing Black as a career offender – had actually been converted to a misdemeanor possession charge under a negotiated plea deal and therefore should not have been used to classify him as a career offender. (Doc. No. 15.)

Upon consideration of the parties' submissions, this court ascertained the need for an

---

[5]Although Black's § 2255 motion is date-stamped "received" on December 12, 2005, under the "mailbox rule," the court deems it filed on the date he delivered it to prison authorities for mailing, presumptively, December 1, 2005, the day that he signed it. *See Houston v. Lack*, 487 U.S. 266, 271-72 (1988); *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001).

evidentiary hearing on Black's claim concerning Atty. Smyly's failure to file an appeal. (Doc. No. 16.)  The court duly appointed counsel and  instructed him (a)to confer with Black regarding the issue specified for an evidentiary hearing and any additional issues, and (b) to file a final statement of all claims to be pursued in Black's § 2255 motion.[6]  (Doc. Nos. 16, 21.)   On July 21, 2006, appointed counsel filed a final statement of claims, in which he essentially reasserted the claims for relief that Black had presented in his § 2255 motion and amendment.  (Doc. No. 27.)  Following a pre-hearing conference held on September 7, 2006, this court entered an order which identified as the single issue submitted for the evidentiary hearing the alleged ineffectiveness of Atty. Smyly in failing to file an appeal on Black's behalf. (Doc. No. 32.)

    The evidentiary hearing proceeded on October 11, 2006.  Based on clarifications by Black's appointed counsel as well as Black's own testimony at the hearing, it is apparent  that Black actually presents the following claims for § 2255 relief, all of which involve allegations of ineffective assistance of counsel against Atty. Smyly:

    1.    Atty. Smyly was ineffective for failing to file an appeal after being instructed to do so.

    2.    Atty. Smyly was ineffective for failing to advise him prior to his guilty plea that he could be sentenced as a career offender.

---

    [6] The Federal Defender was initially appointed to represent Black.  (Doc. No. 16.)  Because of a conflict of interest between the Federal Defender and Black, that appointment was rescinded, and CJA Panel Attorney Pate DeBardelaben was appointed to represent Black on June 9, 2006.  (Doc. No. 21.)

3.    Atty. Smyly was ineffective for failing to challenge his classification as a career offender at sentencing.

## II.  DISCUSSION

### A.    Standard of Review for Ineffective Assistance of Counsel

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial.  To succeed on a claim of ineffective assistance of counsel, a movant must satisfy both prongs of the test set  by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  The *performance* prong requires a movant to establish that counsel performed outside the wide range of reasonable professional assistance and made errors so serious that he failed to function as the kind of counsel guaranteed by the Sixth Amendment.  *Id.* at 687-89.  The *prejudice* prong requires a movant to demonstrate that seriously deficient performance of his counsel prejudiced the defense.  *Id.* at 687.

Under the performance component of the *Strickland* inquiry, a movant must establish that his attorney's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*  In other words, criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000) (quoting *Strickland*, 466 U.S. at 687).

There is a strong presumption that counsel's performance was reasonable and adequate, and great deference is shown to choices dictated by reasonable trial strategy. *Rogers*

*v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994); *see Strickland*, 466 U.S. at 689. Review of an ineffective assistance of counsel claim is conducted from the perspective of defense counsel, based on facts "as they were known to counsel *at the time of the representation*." *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (emphasis in original); *see Strickland*, 466 U.S. at 690.

Under the prejudice component of *Strickland*, a movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The prejudice component of *Strickland* focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Id*. at 687. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Unless a movant satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied. *Strickland*, 466 U.S. at 687. Accordingly, once a court decides that one of the requisite showings has not been made, it need not decide whether the other one has been. *Id*. at 697 (A court need not "address both components of the inquiry if the [movant] makes an insufficient showing on one."); *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998) ("if a defendant cannot satisfy the prejudice prong, the court need not

address the performance prong").

A criminal defendant's right to effective assistance of counsel continues through direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Ineffective assistance of appellate counsel may be shown if the movant can "establish ... that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.... Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Mayo v. Henderson*, 13 F.3d 528, 533 (2nd Cir. 1994).

### B.  Failure to Advise of Possible Classification as Career  Offender

At the evidentiary hearing on October 11, 2006, Black testified that he did not learn he faced classification as a career offender until after he had pleaded guilty when, approximately a week before his sentencing, he received a copy of the PSI, which included the recommendation for career offender enhancement. (*Hearing* TR. at 10.) Prior to that point, Black said, he did not even understand  "career offender enhancement" because Atty. Smyly never discussed it with him before he entered his guilty plea.[7]  (*Id.* at 10, 20.) According to Black, during plea negotiations, Atty. Smyly estimated that his base offense

---

[7]The plea agreement contained no specific reference to the possibility of career offender classification.

9

level would be between 27 and 29 and advised him of a potential sentence between six to eight years. (*Id.* at 9, 33.) Black relied upon Atty. Smyly's advice in this regard when entering the plea agreement. (*Id.* at 9,35.) He maintained that he would not have pleaded guilty had he known that he would be classified as a career offender and thereby subject to a sentence significantly longer than he had anticipated. (*Id.* at 9.)

In his testimony at the evidentiary hearing, Atty. Smyly acknowledged that he did not discuss with Black prior to his guilty plea the possibility that he could be sentenced as a career offender. (*Hearing* TR. at 66, 84, 88.) However, he did not discuss this possibility based on the facts known to him concerning Black's criminal history at the time of his guilty plea. (*Id.* at 84, 88.) Atty. Smyly was appointed to represent Black after the Federal Defender, Black's original counsel, ascertained a conflict of interest in its representation.[8] (*Id.* at 43-44.) After Atty. Smyly's appointment, the Federal Defender turned its case file over to him, including the discovery packet received from the government. (*Id.* at 44.) The discovery packet contained a printout of Black's criminal history, which reflected numerous prior state convictions in Florida, dating back to 1993, but only one prior felony conviction for a crime of violence or controlled substance offense, a 1996 Florida conviction for the sale of cocaine. (*Id.* at 44-45.) Thus, it did not appear that Black was subject to treatment as a career offender. *See* U.S.S.G. § 4B1.1. It was not until after Black had entered his guilty plea that

---

[8]The record reflects that the Public Defender represented Black from August 11, 2004, to October 27, 2004, on which date Atty. Smyly assumed Black's representation. (*See* Docket Sheet, Criminal Case No. 2:04cr169-WHA.)

the probation office, in preparing the PSI, determined that Black had a second felony drug conviction, a 1994 conviction in Florida for possession with intent to sell cocaine (Case No. CR94-915).[9]  This conviction, when coupled with Black's 1996 conviction for the sale of cocaine, meant that Black qualified as a career offender for purposes of sentencing.

Atty. Smyly's pertinent consultations with Black during the period of plea negotiations were conducted in light of the incomplete criminal history contained in the discovery records. According to Atty. Smyly, his initial meetings with Black during this period consisted mostly of discussions on how the sentencing guidelines would apply to Black, particularly with regard to his criminal history.  Atty. Smyly's relevant testimony on direct examination proceeded as follows:

> Q:  And during those negotiations did you consult with Mr. Black about the plea agreement and how it was going and so forth?
>
> A:  Yes.
>
> Q:  Could you tell the Court about those discussions with Mr. Black?
>
> A:  Yes.  It's my routine practice in a federal criminal case when I meet with the defendant after I've obtained the discovery, to initially go over with him the guidelines table and to explain in detail the criminal history category and also the offense level and how these calculations might occur.
>
> So that was –  Since I already had his criminal history, that was part of my initial meeting with him and several meetings thereafter so that he would

---

[9]Black was seventeen years old at the time of the 1994 conviction.  Although Black initially contended that the felony charge in that case was pleaded down to a misdemeanor, both Black and his appointed counsel later abandoned this contention and conceded that the relevant records from the Florida state court reflect an adult felony conviction.  (*Hearing* TR. at 19, 29-33.)

understand just the seriousness of what he was looking at and how his ultimate sentence, if he were convicted, would be determined. So that's how I started out.

Q: And how many times did you meet with him?

A: Oh, at least once a week during the entire representation.

Q: And you'd meet with him once a week, and during all of those meetings did y'all go over the guidelines issues?

A: Initially yes, but after a while it evolved to other matters that we would be talking about. So every time I met with him, no, we didn't go back over them, but to start with that was my primary interest in explaining to him how the guidelines work. And I went over with him the criminal history that we had, which was lengthy. And I asked him to look over it carefully. I left him a copy. Tell me –

Q: Left him a copy of what?

A: The guidelines.

Q: Okay.

A: I mean not the guidelines, his criminal history. I made sure that he had one to take back with him to his cell. And I went over with him several times, "Is there anything else that you know of?"

And he said, "No, that's it."

And I asked him, "Is all of this yours?"

And he said, "Yes, it was."

And I showed him the table on more than one occasion.

Q: By that you mean the guidelines table?

A: Yeah. It's in the back of the book. And I showed him the criminal history

across the top and the rows down, and we discussed how you calculate the range, the points, the offense level. And then I showed him how you have to go across to find the square with the criminal history category that corresponds, and that his range would be there.

Q: Mm-hmm.

A: And when I first got the discovery, it was obvious to me that he was already well over category six. I had counted up eighteen criminal history points, and thirteen is all you needed. Actually, we discussed that. I said, "Even if I knock some of these off, you're still going to be over."

So I told him he was looking at category six from day one, and that the determining factor was going to be the offense level after all the points were added up. And of course I did tell him that I couldn't be sure how they would total up because there might be some things that weren't on this list, but based on the list that we went over several times, I told him that yes, he was probably looking at something between twenty-seven and twenty-nine [as a base offense level]. And then the months, of course, we calculated across.

Now he said I said something from six to eight years. I did have a conversation with him where I told him that after good time, and if he got into a drug program and got that time off, the time he would actually serve might be closer to six to eight years. So that's where that came from.

(*Hearing* TR. at 45-48.)

Following the examination by counsel, the court engaged Atty. Smyly on the critical

issue:

THE COURT: All right. Now one other matter I want to clarify, and it's the essence that goes to the heart of Mr. Black's claim. You admit that you never used the phrase "career offender" when you discussed the sentencing guidelines with him, am I correct?

[Atty. Smyly]: Correct. I told him there could be other things that would change what I was telling him, but that's as specific as I got.

13

THE COURT:  And tell the Court in your own words why you never used the phrase "career offender status" in all your meetings with Mr. Black, leading up to the plea agreement and even during your explanation to him of the plea agreement.  Why did you never use that phrase "career offender status"?

[Atty. Smyly]:  Because the record that we had, that would not exist for him. And I had gone over it with him in detail about other possible felony convictions, and he had said there were none.  So –

THE COURT:  But didn't you say to him, though, there may be some other convictions out there, I don't know what's going to be uncovered?

[Atty. Smyly]:  I said there may be some other things like possibly –  I didn't get specific.  Maybe he committed an offense while on probation, and that would add a point or two here and there.  But I didn't – I don't recall if I said there might be other convictions out there.   But I asked him about other convictions, so I can't recall what my specific words might have been.  I do know I never used the phrase "career offender."  We never discussed it.

THE COURT:  Would it be fair, then, to say that you never used the phrase "career offender" because you relied on the accuracy of what Mr. Black reported to you as his criminal history, and what you knew then as his criminal history?

[Atty. Smyly]:  That's correct.

(*Hearing* TR. at 82-84.)

In response to further questioning by the court, Atty. Smyly demonstrated that he understood the requirements for treatment as a career offender and that, in his consultations with Black before entry of his guilty plea, he asked Black questions designed to uncover any relevant prior convictions:

THE COURT:  I'm asking you what would trigger for you, as an experienced federal criminal defense lawyer, even a communication to a possible – to a defendant that he might be treated as a career offender?  What factors go into

deciding if one is a career offender? You've already testified that it's not simply a question of the criminal history points.

[Atty. Smyly]: Yes. It would be multiple serious felonies, especially drug felonies. That would be the main thing that would trigger my concern.

THE COURT: All right. And at that time you believe that you knew from Mr. Black and from the criminal history records you got about all of the felonies in his criminal history?

[Atty. Smyly]: Correct.

THE COURT: In other words, another misdemeanor probably wouldn't matter at all to his criminal history in terms of converting him to career offender status.

[Atty. Smyly]: No.

THE COURT: Nor would a juvenile offense; that is, an offense that was actually treated as a juvenile offense.

[Atty. Smyly]: No.

THE COURT: The only type of offense which would have converted him to career offender status would have been a felony offense? Was that your understanding?

[Atty. Smyly]: A drug felony offense.

THE COURT: A drug felony offense.

[Atty. Smyly]: Would be the one I was most concerned about.

THE COURT: And you had asked him, had you, about all the drug felony offenses in his history?

[Atty. Smyly]: Yes.

THE COURT: And he never told you about the ninety-four conviction?

15

[Atty. Smyly]: No.

THE COURT: Now had he never told you about it at all, or had he told you about it but described it as a juvenile offense?

[Atty. Smyly]: He never mentioned it. The only way I could realistically go over his criminal history was for him to look at the sheet listing them and take them one by one.

THE COURT: I understand.

[Atty. Smyly]: And that's what we did. And then I asked him, "Are there any more?"

(*Hearing* TR. at 85-87.)

For his part, Black acknowledged that when he entered his guilty plea, he was aware that his criminal history would bear upon the sentence to be imposed; however, in response to questions from this court, he suggested that Atty. Smyly did not fully explain to him the significance of his criminal history under the sentencing guidelines:

THE COURT: What did he tell you about your criminal history category?

[Black]: He never told me nothing about my criminal history category.

THE COURT: Well you knew that you had a criminal history, so did you ask him anything about how the sentencing guidelines might treat your criminal history?

[Black]: No, ma'am. I didn't know nothing about how to figure – how the sentencing guidelines worked. I was going on the advice of my attorney.[10]

---

[10]The court notes that Black would have been classified as criminal history Category VI even without factoring in his conviction in Case No. CR94-915, which triggered the career offender enhancement. The most significant effect of factoring in the 1994 conviction was to automatically

(continued...)

(*Hearing* TR. at 31.)  In addition, Black denied that Atty. Smyly ever gave him a copy of his

criminal history contained in the discovery packet obtained from the Public Defender.  (*Id.*

at 78-79.)  However, nowhere in his testimony did Black forthrightly dispute Atty. Smyly's

contention that he went over the printout of Black's criminal history with him in person

    In *United States v. Pease*, 240 F.3d 938 (11th Cir. 2001), a case with facts somewhat

similar to those here presented,  the Eleventh Circuit held that defense counsel's reliance on

his client's own representations as to his criminal history, resulting in counsel's failure to

inform his client prior to his guilty plea that he could be sentenced as a career offender,[11] did

not constitute deficient performance:

> We agree with the district court that Pease did not establish that his
> attorney's performance was deficient.  Pease's attorney testified at the
> evidentiary hearing that his decidedly limited investigation of his client's
> criminal history included asking the defendant himself if he had prior
> convictions.  As the district court noted, Pease's attorney did not run a
> criminal records check but instead relied on Pease's representations. While the
> limited scope of this investigation is certainly not laudatory, we cannot say as
> a matter of law that reliance on a client's statements is *per se* deficient
> performance.  *Cf. Thomas v. United States*, 27 F.3d 321, 325 (8th Cir. 1994)
> (counsel's failure to inform client of possibility of sentence enhancement as
> career offender does not fall below objective standard of reasonableness).
> Rather, a determination of whether reliance on a client's statement of his own
> criminal history constitutes deficient performance depends on the peculiar

---

[10](...continued)
boost Black's base offense level to 34, as provided under U.S.S.G. § 4B1.1(b).

   [11]The defendant in *Pease* maintained that he relied upon counsel's prediction that his potential
sentence under a plea agreement would be anywhere from five to ten years.  He was ultimately
sentenced as a career offender under the sentencing guidelines to thirty years' imprisonment.  *See* 240
F.3d at 940-41.

facts and circumstances of each case.  *Cf. United States v. Cowart*, 590 F.2d 603, 604 (5th Cir. 1979) (tactical defense decision, considering facts and circumstances, did not result in ineffective assistance of counsel).  The district court did not err in determining that Pease did not establish that his attorney's performance was deficient.

240 F.3d at 941-42 (footnote omitted).

In contrast to counsel in *Pease*,  Atty. Smyly based his estimate of Black's potential sentence, and his decision not to advise his client of the possibility of treatment as a career offender, on *both* Black's representations as to his criminal history *and* the information in Black's criminal history record. [12]  Under the circumstances, this court cannot say that Atty. Smyly's reliance on the accuracy of the criminal history printout in combination with Black's

---

[12]Atty. Smyly was questioned on direct examination about his ability to conduct his own criminal records checks of clients:

Q:  Mr. Smyly, do you have any way to do any criminal history background checks?

A:  No.

Q:  I mean, you don't have authorization to do a law enforcement criminal history check on someone, do you?

A:  No, I don't.

Q:  You rely upon either the Government or the Probation Office in getting criminal history information?

A:  Yes, I think that's routine.

Q:  Because there is really no other way to do it, outside of –

A:  I suppose you could hire private investigators to go everywhere and look for records, but that would not be very practical.

(*Hearing* TR. at 58.)

18

own representations approaches the border of performance outside the wide range of reasonable professional assistance.[13]   Accordingly, Black has not demonstrated that Atty. Smyly's failure to advise him prior to his guilty plea that he could be sentenced as a career offender constituted ineffective assistance of counsel.

### C.    Failure to Challenge Classification as Career Offender

Meriting little discussion is Black's claim that Atty. Smyly rendered ineffective assistance by failing to challenge *at sentencing* his classification as a career offender.  The record plainly establishes that Atty. Smyly filed an objection to the PSI in which he challenged the probation office's recommendation that Black be classified as a career offender; he  argued, among other things, that because Black's 1994 Florida conviction in

---

[13]To the extent that Black claims that his guilty plea was based on Atty. Smyly's incorrect prediction of his sentence and offense level, this court questions Black's entitlement to any relief regardless of the reasonableness of Atty. Smyly's actions in this regard:  during the guilty plea colloquy, Black acknowledged to the court that he understood the possible maximum sentence for his crime to be 25 years and that he understood that his ultimate sentence could differ from estimates given to him by his counsel or the government's lawyers.  *See United States v. Bradley*, 905 F.2d 359, 360 (11th Cir. 1990) (claim that guilty plea was based on counsel's incorrect estimate of sentence did not warrant withdrawal of guilty plea where defendant, when entering guilty plea, acknowledged that he understood the possible maximum sentence for his crime to be greater than the sentence imposed).  *See also Thomas v. United States*, 27 F.3d 321, 325 (8th Cir. 1994) (counsel's failure to inform defendant of possibility of treatment as career offender was not ineffective assistance where defendant, when pleading guilty plea, acknowledged that he understood the possible maximum sentence for his crime); *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) ("misinformation from a defendant's attorney, such as an incorrect estimate of the offense severity rating, standing alone, does not constitute ineffective assistance of counsel"); *United States v. Sweeney*, 878 F.2d 68, 69070 (2nd Cir. 1989) (counsel's "erroneous estimate" of guideline sentencing range not ineffective assistance).

19

Case No. CR94-915 was not disclosed in the criminal history provided as discovery "his designation as a career offender was not expected or contemplated by either the United States, [Atty. Smyly], or Mr. Black when he accepted the plea agreement and changed his plea, which rendered his change of plea not knowing." (*See* "*Addendum to the Presentence Report - Objection No. Two*" at 2 ¶ 8.) In addition, Atty. Smyly also objected that application of the career offender enhancement to Black "substantially upwardly distorted his guideline range" because the combined time actually served for the two offenses made the basis of the career offender designation was less than one year. *Id.*

Atty. Smyly pursued his objections at the sentencing hearing, where he also asked that the government be required to present evidence that Black's 1994 conviction in Case No. CR94-915 was an adult conviction.[14] (*Sentence Hearing* at 12.) Finally, at Black's request, Atty. Smyly filed a motion to withdraw Black's guilty plea and argued at the sentencing hearing that Black was never advised of, and the parties never contemplated, the potential for career offender enhancement. (*Id.* at 5-7.)

Because the record establishes that Atty. Smyly vigorously challenged Black's classification as a career offender at sentencing, Black is not due any relief based on this claim of ineffective assistance of counsel.

---

[14]The record does not support Black's assertion that Smyly failed to obtain or review a copy of his conviction in Case No. CR94-915 prior to sentencing. Moreover, Black fails to present any evidence to indicate that his conviction in that case was not properly considered as an adult felony conviction.

**D.**    **Failure to Appeal**

Black maintains that he wanted to appeal the district court's refusal to allow him to withdraw his guilty plea. He contends that Atty. Smyly rendered ineffective assistance by failing to file an appeal on his behalf after he was instructed to do so.[15]   Black's relevant testimony on direct examination proceeded as follows:

Q: All right, Mr. Black. You've now been sentenced. Did you meet with Mr. – You're not happy at this point, correct?

A: No, sir.

Q: Did you meet with Mr. Smyly after your sentencing date of April the twelfth, oh five?

A: No, not April the twelfth.

Q: Okay.

A: He seen me – Like two weeks later he came to the jailhouse and see me.

Q: Okay. He came to see you. What was discussed?

A: When he came to see me he asked me what do I want to do. I told him I want to withdraw my plea.

He said, "Do you want to appeal?"

I say, "Yeah." He assured me he would. And that's what happened.

---

[15]An attorney's failure to file an appeal after a defendant requests that he or she do so normally should result in the court granting an out-of-time appeal, even absent the defendant showing that he or she would have had any viable grounds for appeal. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *see also Martin v. United States*, 81 F.3d 1083, 1084 (11th Cir. 1996).

Q: All right. You're saying this happened approximately two weeks after the sentencing date?

A: Yes, sir.

Q: Okay. Did you ever receive any kind of communications from Mr. Smyly again?

A: No, sir.

Q: Not by spoken word, not by written word?

A: No, sir.

> THE COURT: I'm sorry, was this meeting two weeks after the sentencing?
>
> [Black]: Yes, ma'am.
>
> THE COURT: Thank you.

(*Hearing* TR. at 15-16.)

Atty. Smyly contends that he did not file an appeal on Black's behalf because Black specifically advised him that he did not wish to appeal. At the evidentiary hearing, Atty. Smyly testified as follows on direct examination with regard to this issue:

Q: And after this plea, after the – I'm sorry. After the sentencing hearing, did you again meet with Mr. Black?

A: Yes.

Q: When was that?

A: My best recollection is that it was the following day.

Q: And why did you meet with him the next day?

A: Because I understood, as all CJA panel attorneys do, that we have an obligation to meet with the client after sentencing to see what he wants to do regarding appeal. And also I knew that you only have ten days. And so I met with him to see if he wanted to appeal.

He had been quite upset in court. And actually I thought that he would want to appeal. But when I got to the jail and met with him, he was quite calm and reflective. Seemed to be at peace with himself. And I asked him if he wanted to appeal, and he said, "Well, what would my chances be on appeal?"

And I said, "Well I don't think you would be successful at all on the career offender enhancement, but possibly I can come up with something that will allow you to withdraw your guilty plea."

He said, "Well, then I'll have to go to court and be tried?"

I said, "That's correct."

And he said, "I'll probably be found guilty."

I said, "That's most likely what will happen."

And he said, "I heard what the judge said, and I'll probably get the maximum."

I said, "That's very likely."

He said, "No, I don't want to appeal. I think I want to turn my life around. I've started to read the Bible, and I'm going to try to learn a trade when I'm in prison."

And I said, "Well good luck." And that was it.

Q: And is that the last time that you've seen Mr. Black?

A: Yes, it relates.

Q: Have you heard from Mr. Black?

A: No, I have not.[16]

(*Hearing* TR. at 67-68.)

Given the sharply conflicting testimony regarding this issue, the court necessarily makes a credibility determination by taking into account the interests of the witnesses in the outcome of the proceedings, the consistencies or inconsistencies in their testimony, and their demeanor on the stand. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). For purposes of resolving Black's claim, the critical issue of disputed fact is, of course, whether Black advised Atty. Smyly that he wanted to appeal. Having observed the witnesses, and having evaluated their testimony for consistency and the feasibility and believability of the positions advanced, the court finds that Atty. Smyly's version is the more credible one on this issue.

Black's insistence that Atty. Smyly delayed two weeks after his sentence before visiting him to discuss appeal begs credulity in light of this attorney's undisputed experience as a

----

[16]At the evidentiary hearing, Black also testified concerning what he claimed were unsuccessful attempts by him and his family members to contact Atty. Smyly by telephone to check on the status of any appeal. (*Hearing* TR. at 38-40.) However, because Black's testimony in this regard appeared to concern events that occurred after the time to file an appeal in his case had expired and pointed to no evidence germane to his claim that he had asked Atty. Smyly to file an appeal before the appeal time had run, the court finds such testimony to have little relevance to Black's claim of ineffective assistance of counsel except to the extent it presents general issues of credibility. Black maintained that "like three months" after he was in prison, he tried to contact Atty. Smyly by phone and left a message on his answering machine. (*Id*. at 38.) He stated that at around the same time, his sister also tried unsuccessfully to reach Atty. Smyly by phone, and "[t]wo months after that she said she finally got in touch with him and he said there were no appealable issues." (*Id*. at 39.) Atty. Smyly testified that he never received any answering machine messages from Black or heard from anybody in Black's family. (*Id*. at 68.)

court-appointed panel attorney for federal offenders.   Lending credence to Atty. Smyly's account of the post-judgment meeting is his declared knowledge of the ten-day, post-judgment deadline for appeal coupled with testimony of his usual pattern. [17] Black's hearing testimony is not entirely consistent with his affidavit regarding phone calls purportedly made by his sister to Atty. Smyly seeking a status report on the appeal.[18]   Notwithstanding his failures to reach Atty. Smyly by phone, he acknowledged making no attempt to correspond in writing.[19] Moreover, review of the sentencing hearing transcript provides support for the

---

[17] In fact, the plea agreement included a waiver of Black's right to appeal (save for prosecutorial misconduct or ineffective counsel), a fact emphasized by the court promptly following his imposition of sentence:

> THE COURT:  The sentence is ordered imposed as stated.  Pursuant to the plea agreement, the  right of appeal has been waived by the defendant.  If there were no waiver, any   appeal would have to be taken within ten days from today.  But the plea agreement provided that the defendant has waived the right of appeal.

(*Sentencing Hearing* TR., 2:04cr00169, at 22).

[18] In opposition to Atty. Smyly's affidavit, Black filed on February 16, 2006 (Doc. 12) his affidavit, which makes no reference to any in-person visit with his lawyer following his sentencing and futile effort on April 12, 2005, to withdraw his guilty plea.  While declaring that [he] advised Mr. Smyly to appeal, and he assured me that he would," Black omits any details pertinent to their encounter for this purpose.  Instead, he recites the attorney's refusal to accept his collect calls from the jails followed by failed efforts to reach him by having "Nora Byrd" call him."   At the hearing convened around eight months later, Black maintained that he met with his lawyer two weeks after his sentencing and advised him to appeal "on Judge Albritton's refusal to let [him] withdraw [his] plea."  Asked about any phone calls to Atty Smyly, he responded: "When I got in prison, like three months I was in prison I tried to contact him.  And I had my sister trying to contact him. . . .I kept getting an answering service." (*Hearing* TR. at 38.)

[19]*Hearing* TR. at 39.   Black's neglect to write his lawyer is especially baffling since he expressed at his "change of plea" hearing on January 24, 2005, satisfaction with Atty. Smyly and dissatisfaction with his previous counsel of record; the following exchange with the court is relevant:
(continued...)

25

_____

[19](...continued)

THE COURT:  Are you fully satisfied with the counsel, the representation and the advice that's been given to you in this case by your lawyer?

THE DEFENDANT:  Yes, ma'am.

***

MS. MORRIS [AUSA]:  Mr. Smyly has been on this case for the last few months but prior to Mr. Smyly, Mr. Van Heest was the attorney of record in this case.  If the plea colloquy could cover both lawyers it would be beneficial.

THE COURT:  Thank you for making the Court aware of that.  Mr. Smyly, how long have you been on?

MR. SMYLY:  Since I believe November 5th, right about that time.

THE COURT:  November 5, 2004.  And Ms. Morris, what does the record show as to when the indictment in this case was filed?

MS. MORRIS:  *** This was a complaint filed on August 9th of '04.  The indictment was on August 17th.

THE COURT:  All right.  Mr. Black, do you recall that another lawyer with the Federal Defender's office, Joseph Van Heest, was your first lawyer shortly after you were  summoned in to court after the complaint  was filed against you in August of 2004?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And are you satisfied with the advice and the representation that you got from him in this case?

THE DEFENDANT:  To be honest with you, no, ma'am.

THE COURT:  In what respect are you not satisfied?

THE DEFENDANT:  Because I didn't really know what was going on then but now I know, now with Mr. Smyly.

(continued...)

explanation Black provided, according to Atty. Smyly, for not appealing – apprehension that

he would be found guilty at a trial and likely fare worse in a post-trial sentencing.[20]

---

[19](...continued)
THE COURT:  All right.  Whatever dissatisfaction you had with Mr. Van Heest, you
have now received full satisfaction with your lawyer, Mr. Smyly, who has helped you
to understand what is going on.

THE DEFENDANT:  Yes, ma'am.

(*Change of Plea Hearing* TR., CR NO. 04cr169-A, at 7-8). *(emphasis added*)

[20]After being advised of Atty. Smyly's intent to pursue the motion filed for withdrawal of
Black's guilty plea, the court addressed Black directly as follows:

THE COURT:  Now, Mr. Black, your lawyer has filed a motion to withdraw your
guilty plea in this case, and I want to hear from you as to whether you understand this
and whether you want to pursue this motion.  I'm not saying I'm going to grant it.
But there is a plea agreement in this case, and the United States has made a motion
in this case regarding a recommended sentence.  And you know what that is.

    I want to tell you that if you withdraw your guilty plea and you go to trial in
this case and you are convicted, it's my understanding that you're looking at
sentencing at the advisory guidelines in this case, if you were convicted of what you
– everything you're charged for, that the advisory guidelines would be 262 to 327
months, that's a statutory maximum of 300 months, that there would be a very good
possibility if you were convicted – or probability, I would say, of your being
sentenced to 300 months in prison, which is 13 years and four months more than what
we're talking about now.  So I want to make sure that if I granted your motion, you
want to roll the dice on being acquitted in this case or take a chance on being
convicted and very possibly being sentenced to 13 years four months more than you
might be sentenced to this morning.  Do you want to withdraw your guilty plea?

MR. SMYLY:  Your Honor, may I also add that he would be at risk of having the
charge that the government is dismissing added back, the gun charge?

THE COURT:  Well, I'm assuming it would be added back.  I think the government
would add it back because they have agreed to dismiss it only in connection with a
guilty plea.  So I assume that the government would add that back in and you would

(continued...)

Upon consideration of the relevant record and testimony, the court concludes that on the day following Black's sentencing, Atty. Smyly discussed with Black whether he wished to appeal and Black advised him that he did not want to appeal. The court does not credit Black's testimony that he advised Atty. Smyly that he wished to appeal and that Atty. Smyly assured him an appeal would be filed. Consequently, the court concludes that Black has not demonstrated that Atty. Smyly rendered ineffective assistance of counsel by failing to file an appeal on his behalf. Black is not due any relief based on this claim

## III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the 28 U.S.C. § 2255 motion filed by Black be denied, as the claims therein entitle him to no relief.

It is further

**ORDERED** that the parties shall **file any objections** to this Recommendation **on or before December 13, 2006.** A party must specifically identify the findings in the

---

[20](...continued)

be tried on all counts and, if convicted, could be – and you should assume that you would be – sentenced to 300 months in prison. Now, with that understanding, do you want to withdraw your guilty plea and go to trial?

THE DEFENDANT: Yes, I do, Your Honor.

(*Sentencing Hearing* TR., 2:04cr169-WHA, at 3-4)

28

Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).


Done this 30th day of November, 2006.


**/s/ Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE

29